# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOHN HARVEY,** | ) | |
| | ) | **No. 13 CV 3247** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,** | ) | |
| | ) | **May 28, 2015** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION and ORDER

After John Harvey sustained a workplace back injury and underwent spinal surgery, an administrative law judge ("ALJ") found that he was entitled to receive disability insurance benefits ("DIB") for the period from April 4, 2007, through July 8, 2008. In April 2010 Harvey filed a new DIB application based on his claim that he remains totally disabled by back pain. After an ALJ denied his application and the Appeals Council declined his request for review, Harvey filed the current lawsuit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross motions for summary judgment. For the following reasons, Harvey's motion for summary judgment is denied and the government's motion is granted:

### Procedural History

Harvey initially applied for DIB in October 2008, claiming a disability onset date of April 2, 2007. (Administrative Record "A.R." 22.) In February 2010, an ALJ found that Harvey was disabled from April 4, 2007, through July 8, 2008, but that

his disability ended on July 9, 2008. (Id. at 34.) Two months later, Harvey filed the DIB application underlying this appeal, again claiming a disability onset date of April 2, 2007. (Id. at 138-39.) After his claim was denied initially and upon reconsideration, (id. at 71-72), Harvey requested and was granted a hearing before an ALJ. That hearing took place on September 8, 2011. (Id. at 35-70.) On November 7, 2011, the assigned ALJ issued a decision determining that res judicata prevents her from reconsidering Harvey's DIB eligibility for the period covered by the first decision awarding him benefits. (Id. at 534.) Turning to the period between July 9, 2008, and the date of her decision, the ALJ concluded that Harvey was not disabled during that period. (Id. at 543.) The Appeals Council declined to review the ALJ's decision, (id. at 1-6), making it the final decision of the Commissioner of the Social Security Administration, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Harvey then filed this lawsuit seeking judicial review of the Commissioner's decision, *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R. 6); s*ee* 28 U.S.C. § 636(c).

## Facts

In April 2007 Harvey was on the job as an iron worker when he lost control of a 300-pound beam he was carrying on his shoulder, causing him to twist and injure his back. (A.R. 519.) He was diagnosed with a disc hernia and treated with physical therapy and steroids, but when those treatments did not work, he underwent back surgery in December 2007. (Id. at 420, 519.) Harvey never returned to work and claims that his back pain only worsened after his surgery. At

2

his hearing before the ALJ, Harvey submitted both documentary and testimonial evidence in support of his claim that he remained totally disabled by back pain after July 8, 2008.[1]

## A. Medical Evidence

In July 2008, seven months after his back surgery, Harvey went to see Dr. Mark Lorenz, his orthopedist, reporting a pain level of seven or eight out of ten. (A.R. 286.) Dr. Lorenz found him to be at maximum medical improvement from a surgical perspective and referred him to a pain clinic. (Id.) Dr. Lorenz further recommended vocational rehabilitation, with restrictions on repetitive bending or squatting and on lifting more than 12 pounds frequently and 21 pounds occasionally. (Id.) Dr. Lorenz wrote that Harvey could sit or stand "as tolerated." (Id.)

That same month Harvey sought treatment with Dr. Gary Koehn at a pain management center. Dr. Koehn examined Harvey and found tenderness in his lumbar paraspinous region with a loss of flexibility and symmetric weakness in his lower extremities. (Id. at 337.) His impression was that Harvey was suffering from persistent back pain that noticeably impacts his activity and lifestyle and markedly disrupts his rehabilitation. (Id.) Dr. Koehn added a Neurontin trial to Harvey's Norco prescription and came up with a medication injection strategy. (Id. at 338.)

---

[1] In his brief to this court, Harvey does not challenge the ALJ's decision not to reopen his case with respect to the period for which a different ALJ granted him DIB: April 4, 2007, through July 8, 2008. (R. 22, Pl.'s Br. at 1 n.1.) Accordingly, the relevant period for purposes of this court's review begins on July 9, 2008, and runs through the date of the ALJ's decision.

Dr. Koehn administered steroid injections to Harvey in July and August 2008, after which he reported a 40% reduction in his pain. (Id. at 333, 459.) At the end of August Dr. Koehn wrote, "I am happy with [his] progress but not his state." (Id. at 459.) At Harvey's last visit in November 2008, Dr. Koehn recommended he use Tylenol for symptom control and return to the pain clinic only as needed. (Id. at 463-64.)

In January 2009 Harvey returned to Dr. Lorenz, who noted that Harvey displayed difficulty with forward flexion past five degrees of motion and with extension, but observed that he had negative straight leg testing and his strength was at five out of five. (Id. at 285.) Dr. Lorenz prescribed a cane for stability and reaffirmed the same work restrictions he had assigned in July 2008. (Id.) That same month, however, Harvey was examined by Dr. Thomas Carlson, who noted that he had positive straight leg raising tests on both sides at 80 degrees. (Id. at 329.) Dr. Carlson observed that despite complaints of pain, Harvey was able to hold his leg "in perfect position" at 80 degrees without the doctor's support, which he characterized as "very unusual for true lumbar disk pain." (Id.) Dr. Carlson noted that Harvey's complaints of severe back pain would be "very difficult to disprove," and wrote that he did not think Harvey could return to any type of work. (Id.)

In March 2010 Harvey went to see chiropractor Keiry Lardi, reporting that his pain was at an eight or nine out of ten. (Id. at 308.) He said that he was not taking his pain medication because he could not afford it. (Id.) Lardi observed that Harvey needed to move between sitting and standing during their interview

because staying in one position was painful. (Id. at 309.) His straight leg tests were positive at about 10 degrees and his flexion and extension were limited. (Id.) Following the examination Lardi wrote that she could not think of any work that Harvey would be able to do and opined that he was "completely unemployable." (Id. at 310.)

Beginning in the spring of 2010 the doctor Harvey saw most frequently was Dr. Spyro Analytis, who helped him with pain medications and with disability paperwork. (Id. at 363.) In April 2010 Dr. Analytis wrote a letter on Harvey's behalf opining that based on lingering back-pain symptoms Harvey was limited in bending, stooping, climbing, and lifting more than 10 pounds total or 5 pounds repetitively. (Id. at 318.) He examined Harvey again in August 2010, noting that he had a hard time bending and sitting for long periods. (Id. at 508.) By the fall of 2010 Dr. Analytis recommended that Harvey be reevaluated by a surgeon, based on his worsening pain. (Id. at 507.) A year later, in the fall of 2011, Dr. Analytis completed a residual functional capacity ("RFC") form for Harvey, opining that he can stand or walk less than two hours in an eight-hour day and can sit for only two hours in an eight-hour day. (Id. at 515.) He further opined that Harvey can lift fewer than 10 pounds occasionally and rarely lift 10 pounds or bend, crouch, or climb. (Id. at 515-16.) He also predicted that Harvey is likely to be absent from work more than four times a month because of his impairments. (Id. at 516.)

In the fall of 2011 Harvey took Dr. Analytis's recommendation that he return to a surgeon, visiting Dr. Rebecca Kuo. In September 2011 Dr. Kuo wrote that

Harvey has severe pain with forward flexion at 30 degrees and with extension, but that his strength was normal. (Id. at 519.) She saw no clear etiology for his persistent back pain, describing his spinal fusion as "excellent." (Id. at 520.) She further noted that she was "having difficulty finding a significant amount of objective findings" that would lead to a conclusion that he was disabled. (Id.) She ordered an x-ray which showed no definite radiographic abnormalities, and a CT scan which showed only mild right foraminal stenosis without significant nerve root compression. (Id. at 525, 527.) Dr. Kuo wrote a letter to Dr. Analytis describing Harvey's condition as "failed back syndrome" without any other clear objective findings. (Id. at 528.) Dr. Kuo did not doubt Harvey's symptoms and encouraged him to consider a spinal cord stimulator. (Id. at 518.)

The record also includes RFC assessments from several consulting physicians. In June 2010 consulting physician Dr. Francis Vincent reviewed the record and opined that Harvey can occasionally lift 20 pounds, frequently lift 10, stand or walk for two hours, and sit for six. (Id. at 475.) He critiqued Dr. Analytis's RFC as being too heavily reliant on Harvey's subjective complaints and as assigning excessive lifting restrictions in light of the objective evidence and Harvey's own daily activity reports. (Id. at 480-81.) In October 2010 consulting physician Dr. Sarat Yalamanchili examined Harvey and found that he had reduced lumbar spine flexion and positive straight leg raise tests to 30 degrees. (Id. at 493.) Dr. Yalamanchili observed him having difficulty getting on and off the exam table and walking on his heels. (Id. at 494.) He wrote that Harvey was able to walk 10

feet without a cane and 70 with one. (Id. at 495.) The next day consulting physician Barry Free reviewed the file and assigned the same RFC that Dr. Vincent had assigned, except that he checked a box saying Harvey needs to use a cane and that he is limited in his ability to reach. (Id. at 498-500.) Dr. Free wrote that he agreed with Dr. Analytis's assessment of Harvey's bending, stooping, and climbing limitations, but felt that his lifting restrictions were unsupported by the objective record. (Id. at 503.) Dr. Free wrote that Harvey's subjective statements were only partially credible, given what he viewed as a disparity between Harvey's description of his symptoms and the objective evidence. (Id. at 504.)

**B.     Harvey's Hearing Testimony**

At his September 2011 hearing before the ALJ, Harvey described the nature and limiting impact of his back pain. Harvey testified that his back pain has intensified since his December 2007 surgery, making it difficult for him to sit or stand for any period of time or to lift anything heavier than a half-gallon of milk. (A.R. 45, 55.) Harvey explained that sitting down puts pressure on his spine so he uses a recliner and keeps pillows under his knees. (Id. at 56.) Harvey said that he is unable to sit or stand for more than an hour at a time. (Id. at 59.) He told the ALJ that his pain during the hearing was a nine or ten out of ten, that his legs and feet were numb and tingling, and that he was having muscle spasms in his back. (Id. at 48-49.)

In describing his daily activities Harvey testified that on a typical day he mostly sits in a recliner and uses his computer. (Id. at 45, 56.) He said that his

mother and girlfriend help him with cleaning, his father or his nephew help him take out his garbage, and he eats mostly ready-made meals. (Id. at 46, 55.) Harvey testified that he drives short distances daily, and drives 25 miles to visit his young daughter a couple of times a week. (Id. at 46-47.) He also said that he had attempted to complete a training program for phlebotomy but was unsuccessful because he had trouble bending over to draw patients' blood. (Id. at 49.) Harvey testified that he uses a cane to help with balance and that he has difficulty carrying things. (Id. at 54-55.) He also said that the pain interferes with his sleep, making it difficult for him to get more than three or four hours of sleep most nights. (Id. at 57.) When asked about medication side effects, he said Norco makes him red in the face, hot, and dizzy. (Id.) Despite these difficulties, Harvey testified that he goes out to socialize six to eight times a month, staying out for as long as three hours at a time. (Id. at 61.)

## C.    The ALJ's Decision

On November 7, 2011, the ALJ issued a decision concluding that Harvey has not been under a disability from July 9, 2008, through the date of her decision. (A.R. 543.) In applying the standard five-step sequence for assessing disability, *see* 20 C.F.R. § 404.1520(a)(4); *Schomas*, 732 F.3d at 706-07, the ALJ found at steps one and two that Harvey has not engaged in any substantial gainful activity since April 2, 2007, and that he has severe impairments including "status post spinal fusion and degenerative disc disease" and "left shoulder impairment with history of surgery in 2002," (id. at 537). The ALJ then determined at step three that Harvey's

impairments do not meet or medically equal any listed impairment. (Id.) Before turning to step four, the ALJ determined that Harvey retains the RFC for sedentary work with the following additional limitations: he can occasionally climb ramps and stairs but never ladders, ropes or scaffolds; he can occasionally balance, stoop, kneel, crouch, and crawl; he can only occasionally reach overhead with his left upper extremity; he must avoid concentrated exposure to hazards; and he must be allowed to use a cane. (Id.) At step four the ALJ concluded that Harvey is unable to return to any of his past relevant work, but at step five, she concluded that Harvey can perform other jobs that exist in significant numbers in the national economy, including Order Clerk, Telephone Quotation/Information Clerk, and Addresser. (Id. at 541-42.) Accordingly, she concluded that Harvey is not disabled. (Id. at 543.)

## Analysis

All of Harvey's challenges to the ALJ's decision relate to her findings at the RFC stage. He argues that in crafting the RFC the ALJ failed to explain adequately her decision to discount Dr. Analytis's opinion, improperly accounted for Harvey's limitations in bending, and erroneously evaluated his credibility. This court reviews the ALJ's decision only to ensure that it is based on the correct legal criteria and supported by substantial evidence. *See Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ is required to "build an accurate and logical bridge between the evidence and the result to afford the claimant

meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). But this court is "not free to replace the ALJ's estimate of the medical evidence" with its own, *see Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), and must uphold the decision even where "reasonable minds can differ over whether the applicant is disabled," *see Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## A.    Treating Physician's Opinion

Harvey first argues that the ALJ erred in giving "little weight" to Dr. Analytis's assessment of his RFC. A treating physician's opinion is entitled to controlling weight if it is supported by objective medical evidence and is not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). Where the ALJ discounts the treating doctor's opinion, she must offer good reasons for doing so, *Scott*, 647 F.3d at 739, such as that the opinion conflicts with that of a consulting physician or is internally inconsistent, *see Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). The regulations also direct the ALJ to consider a number of factors in deciding what weight to ascribe a treating physician's opinion, including the length, nature, and frequency of the treatment relationship, the doctor's specialization, and the consistency and supportability of the opinion. *See* 20 C.F.R. § 404.1527(c); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Here, the ALJ applied the requisite factors and provided good reasons explaining her decision to ascribe little weight to Dr. Analytis's RFC opinion. First

the ALJ noted that Dr. Analytis is an internal medicine physician, not an orthopedic or neurological specialist, and observed that Dr. Analytis saw Harvey only six times in more than three years between July 2008 and September 2011. (A.R. 540.) Turning to the consistency and supportability of Dr. Analytis's RFC, *see* 20 C.F.R. § 404.1527(c)(3), (4), the ALJ noted that the sitting and standing restrictions he assigned in his 2011 RFC were "far more limiting" than the narrative RFC opinion he provided in April 2010, where he did not mention any sitting or standing restrictions. (Id. at 318, 540.) The ALJ also observed that those additional limitations could not be explained by any significant change in Harvey's subjective complaints, his treatment, or the objective medical evidence. (Id. at 540.) The ALJ also noted that Harvey's examining surgeons and the consultative examiners did not ascribe similar limits. She further reasoned that Dr. Analytis's opinion that Harvey can sit for only two hours in an eight-hour day would essentially leave him "nearly bedridden." (Id.) The ALJ properly noted that such extreme debilitation is out of proportion even to Harvey's own testimony, in which he described attending phlebotomy classes, leaving his house daily, regularly driving over 50 miles roundtrip to visit with his daughter, and going out to socialize with friends on a regular basis. (Id. at 538, 540); *see Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) (upholding ALJ's decision to reject treating doctor's opinion that claimant could stand or sit only 30 minutes as inconsistent with claimant's testimony). Because the ALJ analyzed Dr. Analytis's opinion in accordance with the prescribed regulatory factors and because the reasons she gave for discounting

his opinion are supported by the record, Harvey has not shown that she erred in giving his RFC little weight.

Overlooking most of the reasons the ALJ gave for discounting Dr. Analytis's opinion, Harvey focuses his critique on her determination that Dr. Analytis's opinion is inconsistent with the findings of Drs. Kuo, Lorenz, and Yalamanchili. (R. 22, Pl.'s Br. at 8.)  According to Harvey, that reason is flawed because, he says, "Dr. Analytis's opinion is actually consistent with both Drs. Lorenz's and Kuo's findings."  (Id. at 9.)  Specifically, he points to Dr. Lorenz's opinion that Harvey can sit and stand "as tolerated" and Dr. Kuo's suggestion that Harvey pursue treatment using a spinal cord stimulator.  (Id.)  It is unclear what Dr. Kuo's suggestion has to do with Dr. Analytis's opinion regarding sitting and standing, other than to confirm that Harvey experiences back pain, which is not something that the ALJ doubted. Dr. Kuo's treatment suggestion sheds no light on the extent to which Harvey's back pain limited his functioning.  Additionally, Harvey's assertion that Dr. Lorenz's opinion that he can sit "as tolerated" is consistent with Dr. Analytis's opinion that he can sit only two hours is based on nothing more than his own subjective interpretation of those two records.  It is the ALJ's task, not the court's, to weigh this evidence and determine the extent of their consistency.  *Berger*, 516 F.3d at 544.  Here the ALJ was well within bounds to find the opinions conflicting, especially where Dr. Lorenz limited Harvey to lifting up to 21 pounds occasionally and Dr. Analytis opined that he can lift no more than 10 pounds, ever.  (A.R. 285, 318.)  Despite Harvey's assertion that the difference in lifting restrictions is easily

explained by degeneration of his condition over time, he has not pointed to any medical findings suggesting that his strength deteriorated in the intervening 15 months. On the contrary, 6 months after Dr. Analytis first opined that Harvey can lift no more than 10 pounds, examining physician Dr. Yalamanchili found Harvey's upper extremity strength to be normal, with no muscle atrophy. (Id. at 318, 494.) Moreover, Dr. Analytis opined that Harvey could lift no more than 10 pounds in April 2010 and again in September 2011. So rather than reflecting any degenerative change, Dr. Analytis's opinion with respect to his lifting ability remained consistent over time. (Id. at 318, 515.)

Finally, at least with respect to this issue, Harvey argues that the ALJ "did not provide sound reasons" for rejecting Dr. Analytis's opinions because "an ALJ cannot disbelieve a claimant's testimony concerning his pain solely because it seems in excess of the 'objective' medical testimony." (R. 22, Pl.'s Br. at 9.) It is true that an ALJ may not disregard a claimant's subjective experience of pain solely because it lacks an objective explanation, *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006), but how an ALJ should weigh a claimant's testimony regarding pain is a distinct question from how she should weigh a treating physician's opinion. The governing regulations and case law make clear that the supportability of a doctor's opinion—including the extent to which the doctor points to medical signs and laboratory findings—is a factor the ALJ is required to consider. *See* 20 C.F.R. § 404.1527(c); *Moss*, 555 F.3d at 561. Under these rules, the ALJ is entitled to discount a treating doctor's opinion regarding a claimant's limitations if it is out of

proportion to the medical evidence or based solely on the claimant's subjective complaints. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). In any event, here the ALJ did not rest her reasoning solely on a lack of objective evidence, but rather analyzed Dr. Analytis's opinion according to the factors set out in the relevant regulation, explained why she could not square his opinion regarding the "extreme" sitting limitation he assigned with the rest of the record evidence, and then discussed why she found the opinions of Dr. Lorenz and the consulting physicians to be entitled to more weight. (A.R. 540-41.) Because the ALJ's decision to give Dr. Analytis's RFC opinion little weight was both reasonable and sufficiently articulated, Harvey has not shown that she committed any reversible error with respect to weighing his treating physician's opinion. *See Schmidt*, 496 F.3d at 843.

**B.      Harvey's Bending Limitation**

Next Harvey argues that the ALJ committed reversible error in assessing his RFC, because, according to him, the ALJ failed to properly account for his restrictions in bending. Specifically, Harvey argues that the limitation to only occasional bending conflicts with Dr. Analytis's opinion that he can bend only rarely and fails to account for Drs. Lorenz's and Yalamanchili's observations that he has difficulty with forward flexion. (R. 22, Pl.'s Br. at 9-10.) With respect to his first argument, the ALJ gave little weight to Dr. Analytis's opinion regarding Harvey's bending ability, and for the reasons described above, his decision to discount that opinion is well supported. As for the ALJ's treatment of Harvey's difficulty with forward flexion, the ALJ rested her RFC decision partly on Dr. Lorenz's opinion,

noting that he recommended that Harvey not engage in repetitive bending. (A.R. 540.) The ALJ accommodated that recommendation by limiting Harvey to only occasional bending. Moreover, the ALJ also relied in part on the RFC opinions submitted by consulting physicians Drs. Vincent and Free. (Id. at 541.) Both of those doctors reviewed Harvey's medical file and concluded that he is capable of occasional bending. (Id. at 476, 499.)

Harvey points to the Seventh Circuit's decision in *Golembiewski v. Barnhart*, 322 F.3d 912 (7th Cir. 2003), to argue that the ALJ erred in finding him able to bend occasionally despite his flexion difficulties, but that reliance is misplaced. In *Golembiewski*, the Seventh Circuit reversed an ALJ's decision in part because it included no discussion of the claimant's bending limitations despite conflicting assessments from his doctors regarding his bending ability. *Id.* at 917. It was the ALJ's failure to resolve the potential conflict that the Seventh Circuit found to have been an error, not any specific mismatch between the claimant's flexion limits and the assigned bending limitation. *Id.* Here the ALJ did not ignore any substantial evidence or fail to resolve any evidentiary conflict. Instead, she acknowledged that Harvey is most likely unable to perform repetitive bending and assigned a limitation to occasional bending that matched the opinions of the state consulting physicians, whose opinions she afforded "some weight." (A.R. 540-41.)

Perhaps most importantly, in its response to Harvey's brief, the government points out that even if the ALJ erred in assessing Harvey's bending ability, any error was harmless because none of the three jobs she found Harvey could perform

involve any amount of bending. As the government notes, the DOT descriptions for Order Clerk, Telephone Quotation Clerk, and Addresser all state that stooping is not an activity or condition associated with these jobs. *See* DOT §§ 209.567-014, 237.367-046 & 209.587-010, *available at* 1991 WL 671794, 1991 WL 672194 & 1991 WL 671797. In his reply brief, Harvey does not address this point. Because the government has shown that none of the jobs on which the ALJ rested her decision require any level of bending, this court agrees with its assertion that even if the ALJ should have limited Harvey to less than occasional bending, any such error had no impact on her findings at step four, and therefore was harmless. *See Ketelboeter*, 550 F.3d at 625-26.

## C.     Credibility Assessment

Lastly, Harvey challenges the ALJ's assessment of his credibility, arguing that in finding him less than fully credible she erroneously relied on a perceived mismatch between his subjective complaints and the objective evidence and improperly overlooked the state consulting physicians' credibility findings. (R. 22, Pl.'s Br. at 12.) Harvey has his work cut out for him with this argument, because the Seventh Circuit has made clear that an ALJ's credibility determination is entitled to "special deference" and should only be overturned if it is "patently wrong." *See Schomas*, 732 F.3d at 708; *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Although the court will scrutinize the credibility assessment to determine whether it conveys any "fatal gaps or contradictions," it will "give the opinion a commonsensical reading rather than nitpicking at it." *Castile v. Astrue*,

617 F.3d 923, 929 (7th Cir. 2010) (quotation and citation omitted). The court has greater freedom to review the credibility decision when it is based on objective factors rather than subjective ones, like the claimant's demeanor. *Schomas*, 732 F.3d at 708. This high bar to overturning an ALJ's credibility assessment is based on the recognition that an ALJ is best-positioned to determine the claimant's truthfulness. *Shideler*, 688 F.3d at 310-11.

Harvey's challenges to the ALJ's credibility assessment amount to pleas for this court to review the evidence *de novo*, but that is not this court's role. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). For example, Harvey highlights the ALJ's statement that his symptoms were not supported by objective findings and picks various test results and recommendations to argue that his symptoms *were* supported by the objective evidence. Specifically, he highlights as objective support for his testimony Dr. Yalamanchili's observations regarding his difficulty getting on and off the exam table and hopping on one foot, as well as Dr. Kuo's recommendation that he pursue a spinal stimulator. (R. 22, Pl.'s Br. at 12.) But the ALJ explained why she considered Harvey's complaints to be out of proportion to the medical evidence. For example, she highlighted, among other things, CT myelogram results that showed Harvey's fusion was "very solid," Dr. Kuo's inability to locate an objective basis for his described pain level, and the lack of any testing to confirm Harvey's complaints of his hip occasionally "popping out." (A.R. 539.) To the extent Harvey faults the ALJ for overlooking Dr. Vincent's notation that his pain symptoms were "consistent with the objective medical evidence," (R. 22, Pl.'s

Br. at 12 (quoting A.R. 479)), Dr. Vincent also noted that he found Harvey's statements only "partially credible based on objective medical evidence," (A.R. 481), which is consistent with the ALJ's findings. Harvey's credibility argument boils down to an attempt to have this court reinterpret the evidence to draw a different conclusion regarding his credibility. But even where reasonable minds could disagree over what the evidence means, where the ALJ gives supported reasons for the credibility determination this court must uphold it. *See Shideler*, 688 F.3d at 310-11; *Jones*, 623 F.3d at 1163 (declining claimant's invitation to "reweigh the evidence and arrive at a different conclusion"). Accordingly, the arguments Harvey raises here are insufficient to show that a remand for reassessment of his credibility is required.

Importantly, even if Harvey had successfully challenged the ALJ's reasoning with respect to the perceived discrepancy between Harvey's testimony and the objective evidence, the Seventh Circuit has made clear that not all of the ALJ's credibility reasoning needs to be correct, as long as enough of it is. *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (noting that ALJ's credibility determination need not be "flawless"). Here the ALJ included a number of well-supported reasons for her credibility analysis that Harvey has more or less ignored. For example, on the subjective side, the ALJ first noted that Harvey reported at the hearing that his pain level was at a nine or ten out of ten, yet he was able to answer all of her questions without any notable distress or difficulty. (A.R. 539.) Although the Seventh Circuit has been careful not to hold claimants to any kind of "sit and

squirm" test, it has "repeatedly endorsed" the ALJ's entitlement to rely on personal observation to assess the validity of a claimant's testimony. *See Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). That is especially true where the witness shows no sign of discomfort, despite claiming to be under the hold of severe pain. *Id.* The Seventh Circuit has also noted that an ALJ "will often have solid grounds for disbelieving a clamant who testifies that [he] has continuous, agonizing pain." *Johnson*, 449 F.3d at 806. The ALJ was well within bounds to disbelieve Harvey's testimony that he was experiencing the maximum level of pain at the same time he was answering her questions with no apparent distress.

On the objective side, Harvey overlooks the ALJ's discussion of the required regulatory factors in analyzing his credibility. Those factors include his daily activities, his medications and treatment, and any other measures he takes to relieve his pain. *See* 20 C.F.R. § 404.1529(c). For example, the ALJ explicitly addressed his failure to pursue physical therapy during the relevant period. (A.R. 539-40.) An ALJ is entitled to view as an adverse credibility factor a claimant's failure to pursue treatment, as long as she explores the reasons behind that failure. *See* SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996); *Beardsley*, 758 F.3d at 840. Here, the ALJ considered the possibility that Harvey's limited resources stood between him and treatment, but noted that he did not pursue physical therapy even while he was covered by workers compensation insurance. (A.R. 539.) The ALJ also noted that Harvey testified that he smokes a pack of cigarettes a day, which to the ALJ suggested "resources to purchase medication if it were a priority." (Id. at 540.)

Harvey objects to this reasoning and this court agrees that the ALJ is on shaky ground to the extent she did not explore the relative costs of Harvey's cigarette habit and prescribed medication or take into account the addictive nature of smoking. *See, e.g., Eskew v. Astrue*, 462 Fed. App'x 613, 616 (7th Cir. 2011). But the ALJ also noted that when Harvey was reliably taking his medication, his condition improved to the extent that his doctor released him to vocational training. (A.R. 540.) She was entitled to weigh that factor against Harvey in assessing the limiting extent of his pain.

The ALJ also properly took into account Harvey's daily activities, noting that his enrollment in a phlebotomy course suggests that he was more active than he claimed at the hearing. The ALJ noted that the training course was equivalent to light work, and observed that Harvey's main difficulty with completing the course was its bending component. (Id.) The ALJ thought that if Harvey were truly as limited as his testimony suggested he would have described either to his doctor or to the ALJ other aspects of the course that he was unable to keep up with. (Id.) Because Harvey has not challenged this aspect of the ALJ's decision, and because this and the rest of the reasons the ALJ gave for her assessment of Harvey's credibility are well supported, Harvey has not shown that the credibility determination is patently wrong. Accordingly, this court finds no basis for remand with respect to the ALJ's credibility assessment. *See Schomas*, 732 F.3d at 708; ("We give special deference to an ALJ's credibility determination and will not overturn it unless it is patently wrong.").

## Conclusion

Although there can be no doubt from the record that Harvey experiences back pain that negatively impacts his life, reasonable minds could disagree over whether that pain renders him totally disabled. It is the ALJ's task to determine whether it does, and this court's role is simply to ensure that her determination is free of legal error, adequately explained, and well-supported. For the reasons set forth above, the court finds that it is. Accordingly, Harvey's motion for summary judgment is denied, the Commissioner's is granted, and the Commissioner's final decision is affirmed.

**ENTER:**

Young B. Kim
**United States Magistrate Judge**